**UNITED STATES of America,**

v.

**Thomas J. BROWNE and Gerald Cash McNeil, Defendants.**

**No. 97 Cr. 331(SHS).**

United States District Court, S.D. New York.

Feb. 6, 2001.

---

Bruce G. Ohr, Asst U.S. Atty., United States Attorney's Office, Mary Jo White, U.S. Atty., New York City, for Plaintiff.

Alec Eiseman, Alexander E. Eisemann, Labe M. Richmond, Jack Sachs, Kevin H. Marino, Kevin H. Marino, P.C., New York City, for Defendants.

## OPINION

STEIN, District Judge.

Defendants Thomas Browne and Gerald McNeil were convicted of securities fraud in violation of 15 U.S.C. § 78j(b), 78ff, 17 C.F.R. § 240.10b–5, wire fraud in violation of 18 U.S.C. §§ 1343, 1346, violating the Travel Act in violation of 18 U.S.C. § 1952(a)(3), and conspiracy in violation of 18 U.S.C. § 371 after an 11 day jury trial in September of 1998. After learning that the central witness for the government had perjured himself during the trial, Browne and McNeil moved for judgment of acquittal pursuant to Fed.R.Cr.P. 29 or for a new trial pursuant to Fed.R.Cr.P. 33. The motion to acquit the defendants is denied. However, fully cognizant that a motion for a new trial is granted "only with great caution in the most extraordinary circumstances," the motion for a new trial is granted because this Court is "left with a firm belief that but for the perjured testimony, the defendants would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456, 458 (2d Cir.1991).

## BACKGROUND

The charges against Browne and McNeil stem from their participation in a fraudulent scheme to induce customers to purchase the securities of San Diego Bancorp, Inc.[1] Peter Tosto, a stock promoter, recruited Browne, a stockbroker at Hanover Sterling Co. of New York, to locate other brokers willing to induce their customers to purchase San Diego Bancorp stock. In return, Tosto offered to pay Browne a percentage of the brokers' sales. Browne accepted the offer and in turn recruited McNeil, a stockbroker he knew at Greenway Capital, Inc., to induce his customers to purchase the stock. McNeil received a payment from Tosto worth 20 percent of the price of the stock his customers purchased. McNeil, in turn, recruited other brokers into the scheme. Browne and McNeil did not disclose to their customers that they were receiving cash payments in exchange for promoting the stock.

At trial, the government primarily relied upon the testimony of Peter Tosto,[2] the ring-leader of the scheme, who had entered into a cooperation agreement with the government. Tosto testified that "[The cooperation agreement] requires me to be cooperative with the government, turn over all my records that I have, be truthful at this particular hearing and truthful in any things that I have been doing about the government; just be completely honest with all the things I have done and what happened with San Diego Bancorp and anything [the prosecutor] ask[s] me .... and to be honest and answer all [the government's] questions and everyone's questions." (Tr. 272–73). In exchange, Tosto testified that the government would write a letter to the court requesting, pursuant to U.S. Sentencing Guideline § 5K1.1, that he receive a down-

---

1. The summary of the evidence is presented, as it must be on these motions, "in the light most flattering to the prosecution." *United States v. Olbres,* 61 F.3d 967, 970 (1st Cir. 1995) (motion for judgment of acquittal); *see also United States v. Middlemiss,* 217 F.3d 112, 117 (2d Cir.2000) (motion for a new trial).

2. Peter Tosto subsequently changed his name to Peter Lybrand.

ward departure from his sentencing guideline range for having rendered "substantial assistance" to the government. (Tr. 273).

On direct examination, Tosto testified about his extensive previous involvement with crime, including selling narcotics to fellow high school students, sinking his car and reporting it stolen, stealing insurance checks from a close friend who was in a coma, and participating in 22 previous incidents of illegal stock manipulation. However, he also testified that he had abandoned his life of crime once he signed his cooperation agreement with the government in 1994. Specifically, he testified, "There came a point in my life when I decided I didn't want to lie and cheat anymore." (Tr. 749). He also said he had approached the government of his own accord with his tale of wrongdoing because "I wanted to expose myself." (Tr. 1112). In addition, he specifically testified that he believed his business activities in connection with the securities industry at the time of trial were in complete compliance with the securities laws and with his cooperation agreement. (Tr. 755). The government asked the jury to rely on the testimony of Tosto because "Mr. Tosto was very candid with you," "he told you the truth," and "what he told you was corroborated in important ways by other evidence in this case." (Tr. 1790, 1797, 1819). Tosto testified during five of the seven days of trial testimony in this action. Indeed, the Court observed during a side bar conference that "Mr. Tosto is the government's case." (Tr. 1115).

The government also introduced testimony from other brokers who participated in the scheme, from customers of McNeil who purchased the stock, and from an expert witness who testified about the increase in volume of the trading of San Diego Bancorp stock after 1993. The prosecutor offered documentary evidence as well, including Tosto's records, which reflected the daily stock purchases by the brokers and the cash payments he owed them as a result of those purchases, West-ern Union records reflecting interstate wire transfers of cash to Browne, and written confirmations of San Diego Bancorp stock purchases made by McNeil on behalf of his customers. A tape recording of a conversation between Tosto and McNeil was also played for the jury in which McNeil asked whether he would still receive "cash" if he resumed purchasing San Diego Bancorp shares for his customers. The jury convicted Browne and McNeil on all counts.

Approximately 17 months after the trial, the U.S. Attorney's office for the Southern District of New York charged Tosto with securities fraud, perjury, making false statements, and obstruction of justice. Much of the alleged criminal activity took place at the time of, or just before, defendants' trial. On October 18, 2000, Tosto pleaded guilty to committing perjury during defendants' trial, allocuting that:

> On September 15, 1998, I lied under oath during the trial of the case[ ] of U.S. versus Brown[e]. I falsely stated under oath that my dealings with stockbrokers and the investing public had been consistent with federal securities laws since 1995—since 1994, when in fact, I had been committing securities fraud during that time.

(*United States v. Tosto*, 00 Cr. 1082, Plea, Oct. 18, 2000). He also pleaded guilty to all other charges against him.

In July, 2000, this Court denied defendants' request for further discovery into the exact time the U.S. Attorney's office learned of Tosto's perjury, holding that the U.S. Attorney's office for the Southern District of New York was not responsible for knowing about an investigation into Tosto's criminal activities conducted by the Washington, D.C. office of the Securities and Exchange Commission. (*United States v. Browne and McNeil*, 97 Cr. 331, July 20, 2000, Oral Opinion and Order.) While acknowledging that "an individual prosecutor is presumed to have knowledge of all information gathered in connection with that office's investigation of the case,"

and citing *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court also stated—relying on *United States v. Gambino*, 835 F.Supp. 74, 95 (E.D.N.Y.1993) (aff'd. 59 F.3d 353 (2d Cir.1995)) and *United States v. Locascio*, 6 F.3d 924, 949–50 (2d. Cir.1993)—that "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutors." The Court found that because the Washington, D.C. office of the SEC was not involved in the investigation and prosecution of Browne and McNeil, and because the SEC investigation into Tosto did not begin until four months after the trial ended, the U.S. Attorney's office in the Southern District of New York had no reason to know that Tosto had perjured himself at the time the perjury was committed. (*United States v. Browne and McNeil*, 97 Cr. 331, July 20, 2000, Oral Opinion and Order.)

DISCUSSION

## A. Standards for new trial when a lead witness commits perjury

The U.S. Court of Appeals for the Second Circuit has articulated two discrete standards that govern when to grant a motion for a new trial based on the perjury of the government's central witness. First, if the government knew or should have known about the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456. Reversal in that situation is "virtually automatic." *Id.* However, in this case, as noted above, this Court has already found that the government did not know, nor should have known, that Tosto committed perjury during this trial.

The second standard enunciated by the Second Circuit is utilized "where the government was unaware of a witness's perjury," as here. In that event, "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* (citing *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988)). The question for resolution, therefore, is whether this Court has that "firm belief."

## B. Application of the *Wallach* test

In holding that a new trial should be granted in this case, the Court heavily relies on *United States v. Wallach*, not only for its articulation of the law, but also for its application of the law to the facts, since the facts here are so strikingly similar to those in *Wallach*. In that case, the government's primary witness committed perjury in the trial of three defendants convicted of engaging in a pattern of racketeering activity in connection with their efforts to lobby for government contracts. The witness testified that he previously had been involved in illegal gambling activities, but he had stopped his compulsive gambling one year before the trial. After the trial, the parties learned that the witness had in fact gambled during that year. *Wallach*, 935 F.2d at 455.

The Second Circuit held that the government "knew or should have known" about the perjury and ordered a new trial pursuant to that standard. The Court also explained that, "even assuming that the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted." *Id.* at 458. It reached that conclusion "cognizant that a motion for a new trial on the basis of newly discovered evidence is granted only with great caution in the most extraordinary circumstances." *Id.*

That Court found that the witness's "false testimony regarding his gambling directly calls into question the veracity of the rest of his statements. [The witness's] testimony was essential to the government's case; indeed, he tied all the pieces together." *Id.* The Court also observed that:

[The witness] was the centerpiece of the government's case. Had it been brought to the jury's attention that [the witness] was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury. It was one thing for the jury to learn that [the witness] had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie.

*Id.* at 457. In addition, the opinion noted that the government "made much of [the witness's] motive for telling the truth" by explaining the terms of the cooperation agreement in its redirect and closing. *Id.* at 458. Thus the perjury, although only related to the witness's credibility and not to the substantive offenses, was "material" under the stringent standard in *Wallach* and warranted a new trial as a matter of law. *Id.*

In this case, Tosto lied about his involvement in crime at the time of trial. The lie, as in *Wallach,* calls into question his credibility; it was not a lie about the substantive offenses. Tosto too was "the centerpiece of the government's case." Indeed, as noted, during the trial the Court observed that "Mr. Tosto is the government's case." Tosto, just as the witness in *Wallach,* also testified that he had undergone a "radical moral transformation" when he said he "didn't want to lie and cheat anymore." Furthermore, the government in its case in chief introduced Tosto's cooperation agreement as evidence of his motive for telling the truth. In essentially all respects, the *Wallach* case is directly on point.

The government takes two tacks to distinguish *Wallach.* It argues first that the newly discovered evidence of Tosto's perjury is merely cumulative impeachment evidence. To be sure, evidence that would be offered solely to further impeach a witness whose character was already challenged at trial does not ordinarily warrant a new trial. *See United States v. Damblu,* 134 F.3d 490, 494 (2d Cir.1998); *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995). However, the very cases cited by the government actually demonstrate that this general rule does not necessarily apply where the perjury is committed by the key government witness. *See Damblu,* 134 F.3d at 494 (distinguishing *Wallach* on that basis); *Payne,* 63 F.3d at 1210 ("[I]mpeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime" or was the witness on whom the government's case "almost entirely" depended). Indeed, the Second Circuit rejected the very same argument in *Wallach* because of the importance of the witness and the centrality of the perjury. *Wallach,* F.2d at 458.

Second, the prosecution contends that a new trial is not necessary when the witness's testimony is corroborated by other evidence. *See Payne,* 63 F.3d at 1210; *Romero v. United States,* 28 F.3d 267, 268 (2d Cir.1994) (finding that "the remaining proof is sufficient to sustain [the defendant's] conviction on all the charges against him"); *United States v. Spencer,* 4 F.3d 115, 119 (2d Cir.1993) ("[T]he district court correctly found that persuasive independent evidence supported the defendant's conviction. There was overwhelming testimony from six buyers of [defendant's] narcotic that established [defendant's] manufacture of methamphetamine.").

At oral argument, the government relied heavily on *Payne,* 63 F.3d 1200, to argue that the existence of independent evidence distinguishes this case from *Wallach. Payne,* however, is too weak a reed on which to place so much weight. In *Payne,* the Second Circuit held that although the government had failed to disclose impeachment evidence against one of its own witnesses, the violation was not material under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Payne,*

63 F.3d at 1211. Notwithstanding the fact that the legal standard of materiality under *Brady* is different than the standard articulated in *Wallach* (compare *Payne*, 63 F.3d at 1210 with *Wallach*, 935 F.2d at 457–58), there are also key factual distinctions that make *Payne* inapplicable to these facts.

First, the impeachment evidence proved, at most, that the witness had previously lied under oath in an effort to avoid punishment. *Payne*, 63 F.3d at 1210. It did not prove that the witness had committed perjury during the trial. A juror may well find that a lie during the trial itself is far more egregious than a lie told prior to the trial.

Second, the witness at issue in *Payne* was merely one of three major government witnesses. The other two were an informant who purchased drugs from the defendant and a Drug Enforcement Administration agent who supervised the undercover purchases. *Id.* at 1203. There were also extensive incriminating tape recorded conversations between the informant and the defendant, as well as other physical evidence. *Id.* For this reason, the witness's testimony was determined to be "but a fraction of the evidence linking" the defendant to the crime. *Id.* at 1210.

Here, while there was a certain amount of corroborating evidence linking Browne and McNeil to the charged crimes, Tosto's testimony was far more than "a fraction" of the evidence: it was the case's keystone. It was Tosto who described how the entire scheme worked and how various actors were brought into the scheme and executed their crimes. Most importantly, Tosto was the only witness who provided direct evidence of intent, i.e. that the scheme was intended to defraud investors by inducing them to buy stock in a worthless company. The other cooperating witnesses testified that they were under the impression that the stock was a worthwhile investment for their customers. (Tr. 1384, 1613–14). The defense also submitted public documents showing that San Diego Bancorp stock would have been considered a reasonable investment opportunity. Even the tape of the phone conversation between McNeil and Tosto offers some proof that McNeil might have believed the stock to be a worthwhile investment. As the defense argued in its closing, intent was the key element in the case. Without criminal intent, Browne and McNeil's actions were merely regulatory violations rather than criminal offenses.

In addition, one of the central pieces of corroborating evidence that the government used is Tosto's own records. The defense attempted to argue at trial that Tosto reconstructed his records after the fact in order to cooperate with the government, instead of entering each transaction into his record journal at the time it took place. If the jury had been told that Tosto lied to them at trial, the jurors may have discredited a great deal—if not all—of his testimony, including the testimony concerning his records.

## C. Other grounds for relief

The defendants challenge numerous other rulings relating to their convictions. The claims range from attacks on the sufficiency of the evidence in proving certain elements of the offenses, to charges of error in instructing the jury. The Court has carefully examined all of these claims and finds them to be without merit. Therefore, defendants' Rule 29 motion is denied.

CONCLUSION

The Court is fully aware that a new trial is only granted "with great caution in the most extraordinary circumstances," *Wallach*, 935 F.2d at 458, and "if the interests of justice so require," Fed.R.Cr.P. 33. After presiding over the trial, and subsequently reviewing the record, this Court can neither diminish the importance of Tosto's testimony nor condone the perjury of a lead witness. The Court's "firm belief" that but for Tosto's perjured testimony, Browne and McNeil "would most likely

not have been convicted" requires that they be given a second day in court.