UNITED STATES of America, Appellee,

v.

Calvin W. BREIT, Appellant.

No. 84–6628.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided July 18, 1985.

---

See also 754 F.2d 526.

James C. Roberts, Anthony F. Troy, Richmond, Va. (Robert D. Seabolt, Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellant.

William G. Otis, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before HALL and SNEEDEN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

Calvin W. Breit appeals from the district court's order, denying his motion for a new trial based on an alleged *Brady* violation.[1] We affirm.

## I.

Breit was indicted, *inter alia,* on one count of conspiracy, in violation of 21 U.S.C. § 846, and six counts of possession and aiding and abetting possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, on August 6, 1982. Overt act number 10 of the conspiracy count charged that:

On or about April 25, 1980, in the vicinity of Virginia Beach, Virginia, CALVIN W. BREIT, Defendant herein, tendered to an unindicted co-conspirator a cashier's check in the approximate amount of $35,000 drawn on the Virginia National Bank, payable to David Wil-

1. *Brady v. Maryland,* 373 U.S. 83 (1963).

liams, such funds to be utilized in the purchase of cocaine.

Count Five was the substantive count pertaining to the alleged overt act involving the $35,000 check. Government witness Harry Creta testified he received the $35,000 check from Breit and used the proceeds to purchase cocaine from Thomas Glenn ("Tommy") Flowers, Jr. Count Seven, also a possession count, was based on testimony of Charles MacElwain that in May, 1980, he had purchased cocaine with funds supplied by Breit. The government also used Creta's testimony to connect Breit to the MacElwain purchase.

On August 11, 1982, Breit filed a fifteen-page general motion for discovery and inspection under Fed.R.Crim.P. 16 and for exculpatory evidence. In particular, Breit requested "impeaching evidence" and elaborated as follows:

(1) The defendant specifically requests evidence or information which may be used to impeach any government witness or which may lead to evidence which might be used to impeach any witness.
(2) Defendant further requests disclosure of any statements of any individuals which may be inconsistent, in whole or in part, with any other statement made by the same individual; and any statements made by any individuals, which are inconsistent, in whole or in part, with any statements made by other individuals who have given statements relevant to the charges against defendant.

In response to Breit's request, the government asserted it had no *Brady* material beyond what it intended to give and ultimately gave defense counsel in the form of "Jencks" statements [2] of its witnesses. The district court then dismissed Breit's *Brady* motion as moot.

Harry Creta was the government's principal witness at trial. The sum of his testimony was that Breit financed several cocaine purchases in late 1979 through the early part of 1980: Breit provided cash for Creta to purchase cocaine, and Creta used Flowers as a source to supply cocaine and

returned a profit of $7,000 to $12,000 to Breit for each investment, totaling $60,000.

Creta testified he entered into a number of cocaine "buys" from Flowers, the first of which did not involve Breit. He said that in April, 1980, he asked Breit for money to fund a cocaine purchase from Flowers. According to Creta, Breit gave him a check for $35,000, dated April 11, 1980. Creta stated that he and Flowers went to the drive-in window of a local bank where Creta negotiated the check. Creta told the jury that his bank trip with Flowers was the consummation of their fourth and final deal in which he intended to pay $20,000, as payment in full, for "ten or eleven ounces" of cocaine. Creta further testified he received from the bank teller $20,000 in cash and a $15,000 cashier's check made out to him. Creta identified as the checks in question (1) a copy of a $35,000 check bearing his endorsement as well as David Williams' and (2) a copy of a $15,000 cashier's check dated April 24, 1980, and noted at the bottom "B[alance] of 353 exchange check, Bank of Virginia." These copies were admitted into evidence. Creta said he gave the $20,000 cash to Flowers to pay for the cocaine and, after endorsing it, returned the $15,000 cashier's check to Breit. Creta was then asked whether the April 24, 1980, date on the cashier's check was the date he drove Flowers to the bank. He replied that it was.

On cross-examination, however, Creta acknowledged that his memory of the transaction was imperfect. He testified that at first he thought he gave to Flowers both the $20,000 cash and the $15,000 cashier's check, but also said that when shown the cashier's check, he remembered giving it to Breit. He further stated he knew that Breit was involved with one check, "but I couldn't put the figures and the times together exactly."

Flowers, a federal prisoner at the time of Breit's trial, had been transported to Norfolk as a potential government witness. The prosecution, however, did not call

---

**2.** Jencks Act, 18 U.S.C. § 3500; Fed.R.Crim.P. 26.2.

Flowers to corroborate Creta's testimony that Flowers was present during the April 24, 1980, negotiation of the $35,000 check at the drive-in teller window.

Breit took the stand in his own defense and denied participating in any cocaine deals. He did not deny, however, that he had delivered the $35,000 check to Creta. He also admitted that Creta had given to him a $15,000 cashier's check. He claimed he gave Creta the $35,000 check as security for a personal loan to satisfy gambling debts and asserted that the $15,000 cashier's check constituted the actual loan proceeds. Breit explained the two checks by stating that he had asked Creta to cash the $35,000 check because he knew Creta had money and because he (Breit) was embarrassed to go to the bank with a check of that size. He further testified that Creta returned to him both the $20,000 cash and the $15,000 cashier's check a day or two after Creta went to the bank.

Accordingly, Creta's and Breit's testimony agreed on three points: (1) that Breit gave to Creta a $35,000 check in April, 1980; (2) that Creta cashed the check at the bank; and (3) that Creta returned to Breit a $15,000 cashier's check obtained as part of the proceeds. Their testimony disagreed only on what became of the $20,000 cash: Creta said he gave it to Flowers to pay for the cocaine deal in which he and Breit were engaged, whereas Breit said the cash was returned to him along with the $15,000 cashier's check. The jury believed Creta, concluded that the check transaction was intended to fund a cocaine deal, and convicted Breit of conspiracy and two possession counts (Five and Seven). We affirmed. *United States v. Breit,* 712 F.2d 81 (4th Cir.1983).

After his conviction, Breit became an inmate at the federal correctional facility in Petersburg, Virginia, where Flowers was also incarcerated. Almost immediately after his release from Petersburg, Flowers was visited by an investigator hired by Breit's family. Thereafter, Flowers gave a sworn statement on May 10, 1984, in the offices of Breit's present counsel.

In the statement, Flowers maintained that during Breit's trial he was interviewed by three Assistant United States Attorneys, Raymond Carpenter, Patricia Kerwin, and Tommy Miller. He stated he told them that Creta did not receive a $15,000 cashier's check as part of the proceeds of the $35,000 check. Instead, Flowers asserted that Creta gave him $27,000 in cash and kept the remaining funds. He said he had only two, not four, transactions with Creta, one of which related to the cashing of the $35,000 check. Flowers also stated that the check transaction occurred during cold weather but acknowledged that he could not recall the date because "it has been a long time." He further admitted he had been in Florida and had traveled to Virginia for the transaction. Although Flowers' initial response to a question concerning his apparel on the day in question was that "I don't know.... I can't remember what I was wearing," he eventually stated, after repeated questioning by counsel, that he was wearing a heavy sweater with a thermal lining. Other than the memory of cold weather, Flowers was unable to recall the date or even the month of the check transaction. He also stated that the other transaction occurred before the one involving the check.

Based upon Flowers' statement, Breit moved for a new trial on June 11, 1984. Breit argued that Flowers' May 10, 1984, account of the transaction differed from Creta's trial testimony on at least two points: (1) whether the transaction occurred when the weather was warm or cold and (2) whether the check proceeds were returned to Creta wholly in cash or partly in cash together with a $15,000 cashier's check. The thrust of the motion was that when Assistant United States Attorneys Carpenter, Miller, and Kerwin learned of these discrepancies between Flowers' story and the testimony they knew Creta would give at trial, but did not disclose them to Breit, they breached not only the requirements of *Brady* but probably the Code of Professional Responsibility as well. Alternatively, Breit contended that a new trial

was warranted even if the government was unaware that Flowers would have contradicted Creta.

Prior to the hearing on the new trial motion, Breit moved on July 3, 1984, for disclosure of the transcript of Flowers' grand jury testimony. He also requested that a subpoena *duces tecum* be issued to the United States for all notes of interviews between Flowers and government personnel. The government furnished the transcript of Flowers' grand jury testimony and notes of an interview in May, 1982, between Flowers and FBI Agent Joseph O'Brien.

Like Creta, Flowers stated to the grand jury that the $35,000 check transaction was undertake to obtain cash for the last installment payment of their final cocaine deal. According to Flowers, this final deal was only the second time Creta had purchased from him and was for the sale of one kilo. He told the grand jury that the first incident occurred "[s]ometime in early 1980.... March, April, May" and that "[t]he second time was one to three months following that, so that within that time frame, I'd say between June—June to the first of the year." Flowers then described how Creta obtained the cash to pay the installment on the last deal by going to a drive-in window at a bank. Flowers said he saw the check and "it had $35,000 written on it.... It might have been 30, and it might have been 28. But it was a large amount of money." Flowers further told the grand jury that Creta paid him "15– or 20,000 of [the proceeds from the check], had some left over." Flowers admitted he did not know if Creta received the entire amount of the check in cash and later said Creta did not pass the "checks" or bank forms to him for review.

FBI Agent O'Brien interviewed Flowers the day before his grand jury appearance on May 27, 1982. His notes of the interview show that Flowers recalled that the check transaction "might" be connected with his second and final cocaine deal with Creta. The relevant passage of the agent's notes reads as follows:

Flowers remembers that on one of the trips Creta did not have all the money to pay for the cocaine so he was paid by Creta in installments. Creta came to the motel and said he had a check which he showed to Flowers which was to be used as payment. The check was large in size. Flowers remembered that the check was for $35,000. This might be the second purchase because Flowers remembers they drove in Cretas [sic] car to the bank. He recollects driving from the oceanfront and going along Va Beach Blvd and turning on Lynnhaven Rd. The bank was generally on the southside of the expressway in Va Beach and possibly had a green logo. Creta drove into the drive in and Flowers remembers that it was late pm near closing time (5–6 pm). The people in the bank knew Creta and called him Harry. Flowers got the indication that the size of Cretas [sic] transaction was not unusual. The manager came to the window and said Hello Harry and said he would have to get the money from the vault. When they drove away Creta gave Flowers between $15,000 and $20,000. This was the final payment on the deal.

4 to 6 months before the Explorer First deal possibly in the months of March April or May—2nd deal possibly June or July of 1980.

Breit's position at the hearing on the new trial motion was that the government had denied him his rights under *Brady* by its failure to disclose Flowers' grand jury testimony and Agent O'Brien's interview notes in response to Breit's pre-trial motion to discover all impeaching and exculpatory material. The principal theme of Breit's argument was that these two items of asserted *Brady* material showed clearly that Flowers recalled a different date for the check transaction from the date Creta remembered.[3] Breit also contended that

---

**3.** Breit did not pursue his initial contention that Creta received in cash the entire proceeds of the

$35,000 check and that Creta, therefore, must have been lying or describing some other trans-

Flowers' account of the transaction was newly discovered evidence warranting a new trial in any event.

Breit's lead counsel at trial, Richard G. Brydges, testified he had not been furnished, prior to or during trial, with either the Flowers grand jury transcript or interview notes, or any material designated as *Brady* or "Jencks" material pertaining to Flowers. Brydges admitted he had been advised by the lead prosecutor, Raymond Carpenter, at the end of the government's case that Flowers was available to be called as a defense witness. Brydges further testified that the fact that Breit had been furnished no *Brady* materials with respect to Flowers caused Brydges to "assume [Flowers] would have corroborated what Mr. Creta was saying, which I didn't want to elicit, certainly."

Flowers then testified regarding his recollections of his cocaine deals with Creta. He was questioned closely about the date of the transaction involving the check. Initially, he testified that the transaction occurred "sometime prior to" July or August, 1980, but qualified his answer by adding that there were "so many dates involved in this whole thing, it is confusing." He testified that it was cold but limited that answer as well, by noting he had been living in Florida where the weather had been "particularly warm." Flowers stated that Assistant United States Attorney Tommy Miller had asked him about the $35,000 check prior to his grand jury appearance but stated "the time period is hard to get down and say it was May or June or whatever.... [T]hey asked me what time of year it was but I couldn't be entirely sure, pinpoint a day or anything like that." He said he had "probably" told the interviewing agent that the check transaction was possibly in June or July of 1980. Flowers said he did not believe he had told anyone, including Carpenter, that the transaction occurred in April—not because he was certain that it did not occur then, but because

he was not sure when it occurred. Nevertheless, he asserted he was now sure it was during "a cold part of the year. I know that."

On September 19, 1984, the district court denied Breit's motion for a new trial. The court found that FBI Agent O'Brien's notes were *Brady* material, as was Flowers' grand jury testimony to the extent it was consistent with the notes. The court concluded, however, that Breit's pre-trial request for *Brady* material was not ·"specific" within the meaning of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), because the inquiry was included among "page after page after page of discovery requests from the defendant," requests covering "every conceivable question" that might arise in a criminal case. Nonetheless, the district court assumed for purposes of its opinion that the request was specific and turned to the question of whether the material, if disclosed prior to trial, might have led to a different outcome.

The court further found that Flowers was a "wholly unsatisfactory witness" and stated that even assuming Flowers were telling the truth, Flowers' shifting memory of one detail—the date of the transaction—showed at most that the transaction "occurred sometime between the first of the year and the middle of the year." The court then noted that even if Flowers' statements could be taken as disputing the government's evidence of the exact date of the transaction, the statements in virtually every other detail corroborated the account Creta gave at trial. The court concluded that the dispute as to the date of the transaction "would have netted the defendants absolutely nothing" because Flowers' memory of the date was consistent with Creta's trial testimony showing the transaction to have occurred on April 24, 1980, which date was indisputable based upon the documentary evidence. Indeed, the court went beyond that and found, as a former defense

action when he testified at trial that he obtained $15,000 of the proceeds in the form of a cash-

ier's check.

attorney, that "the testimony of Tommy Flowers would have been harmful to the defendant."

In the alternative, the court found that "there was no fundamental unfairness to the defendant in the withholding of this particular *Brady* material ... where the witness was made available for interview and for calling as a witness had the defendant chosen to do so." Finally, the court found that the evidence "was not newly discovered, because with due diligence, it would have been discovered prior to the time that the defendant rested its [sic] case, and that the evidence was available through the witness, Flowers, and the witness, Flowers, would have been available to testify, and was specifically made available by the government."

Breit appeals.

## II.

■ On appeal, Breit contends that the government's failure to provide him with the transcript of Flowers' grand jury testimony and Agent O'Brien's interview notes constitutes a denial of due process requiring a new trial. Breit argues he specifically requested exculpatory materials, such as the grand jury testimony of Tommy Flowers and interview notes of Agent O'Brien. He maintains that the district court erred in ruling that the undisclosed *Brady* material could not have affected the outcome of the trial. Consequently, Breit asserts that his convictions on the conspiracy count and two possession counts (Five and Seven) were obtained in violation of the due-process clause and must be vacated. We disagree.[4]

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held that under *Brady*, the suppression of exculpatory evidence will vitiate a conviction in three situations, two of which are relevant to this appeal: (1) where the defense has requested, but has been denied, the production of specific evidence material to the issue of guilt and the undisclosed evidence "might have affected the outcome of the defendant's trial;" and (2) where the defense has either made no request or has made only a general request for all exculpatory evidence, but the prosecution suppresses evidence that could "create a reasonable doubt [of the guilt of the accused] that did not otherwise exist." *Id.* at 103–13, 96 S.Ct. at 2397–2402; *Chavis v. North Carolina*, 637 F.2d 213, 222–23 (4th Cir.1980).

■ We must first determine whether Breit's request was "general" or "specific" within the meaning of *Agurs*. The test to determine if a request is "specific" for *Brady* purposes is whether it fairly puts the government on notice of "exactly what the defense desire[s]." *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399. Contrary to appellant's contention, we conclude that the request in this case was a "general" one. Breit's initial request was set forth on the fourth legal-sized page of a fifteen-page,

---

**4.** Breit also contends that the district court erred in ruling that the government fulfilled its *Brady* obligation by merely stating to defense counsel that an individual named Tommy Flowers was in custody and available to be called as a witness. We agree. The government's failure to identify *Brady* material here, misled Breit's counsel into believing that Flowers' testimony would actually be harmful to his client. We conclude that the government may not discharge its obligations under *Brady* by merely tendering a witness to defense counsel without

providing any indication that the witness' testimony may be helpful to defense or, at a minimum, indicating the witness is being tendered pursuant to the government's *Brady* obligation. *See Jones v. Jago*, 575 F.2d 1164, 1167–68 (6th Cir.), *cert. denied*, 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978); *United States v. Sheehan*, 442 F.Supp. 1003, 1009 (D.Mass.1977); *Emmett v. Ricketts*, 397 F.Supp. 1025, 1043 (N.D.Ga. 1975). This is not reversible error in this case, however, because we affirm on the district court's alternative reasoning.

single-spaced pleading entitled, "General Motion for Discovery and Inspection under Rule 16 and Motion for Exculpatory Evidence and Memorandum in Support Thereof." This initial request did not mention Flowers by name.[5] Before the opening of trial, Breit's counsel renewed the request by asking that the government produce statements, and in particular grand jury testimony, of witnesses who were alleged to have been involved in overt acts but who later maintained that they had no knowledge of these acts or of Breit's involvement in them. Although counsel knew when he made this request that Creta had told the grand jury that Flowers was with him at the bank for the $35,000 transaction specified in overt act number 10, counsel made no reference to Flowers.

Breit's request stands in sharp contrast to the one considered in *Brady*, which asked for statements from the defendant's accomplice by name. Indeed, the Seventh Circuit requires the defendant to focus his request on a particular witness before it will hold the request to be specific. *United States v. Mackey*, 571 F.2d 376, 389 (7th Cir.1977). *Accord Mixon v. Attorney General of the State of South Carolina*, 538 F.Supp. 190, 194 (D.S.C.1982). The request here did not merely fail to focus on Flowers; it failed to focus on anything. It contained no names, no descriptions even in general terms of events or transactions, and no guidelines of any kind that were specific to this case. It consisted of two sentences which together employed the hallmark word of generality—the word "any"—nine times. It was included among "page after page after page" of the kinds of questions "which could have been filed in any criminal case that has ever been presented." We cannot construe such a request to put the government on notice of "exactly what the defense desired." *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399.

Breit urges us to hold that a request is "specific," however general its language, if it is as specific as possible under the circumstances. We are not persuaded. Appellant's argument ignores the test in *Agurs* that the extent of the duty imposed on the government by a *Brady* request turns on how effectively it alerts the government to what the defense wants. Moreover, Breit fails his own test. At least by the time the trial commenced, Breit knew that Flowers was with Creta at the bank for the $35,000 transaction and that Flowers played a part in providing the drugs that this money was used to purchase. Nonetheless, Breit omitted any mention of Flowers.

Having held that the request at issue is a "general" one under *Agurs*, we further conclude that the correct standard for deciding the new trial motion was whether the statements were "of sufficient probative value to create a reasonable doubt of the guilt of the accused where none theretofore existed." *Chavis*, 637 F.2d at 222–23. For the reasons that follow, we hold that they were not. Even if the request here were "specific," thereby triggering the less rigorous standard of materiality, *i.e.*, whether the statement "might have affected the outcome of the defendant's trial," *id.* at 104, 96 S.Ct. at 2398, we hold that the district court properly denied Breit's new trial motion.

The government argues that non-disclosure of Flowers' statements do not warrant a new trial under *Brady* because the statements supported rather than impeached the government's evidence. We agree. Flowers' undisclosed statements to the grand jury and Agent O'Brien supported in virtually every particular the government's evidence and, therefore, could not have affected the jury's verdict. As the district court observed, a comparison of Flowers' two statements about the check transaction with Creta's trial testimony about that episode reveals:

> [T]hat the transaction did indeed occur; that the transaction occurred with respect to a drug transaction, cocaine transaction, specifically; that the amount of the check was $35,000; that the transaction took place at a bank window; that

---

5. See *supra* at 2.

it was late in the afternoon; that he was in an automobile with Harry Creta; and that Harry Creta conducted the bank transaction; that Harry Creta did not pay him all of the proceeds of the cashed check; that Harry Creta kept a part of the proceeds and paid him other parts of the proceeds; that he estimated the amount of money paid to him by Harry Creta at anywhere from $15,000 to $27,000, a range wholly consistent with the sum of $20,000 [to which Creta testified at trial].

The congruence between the two accounts is striking. We are not persuaded that the defense could have used Flowers' statements to impeach Creta.

Only Flowers' vague and ever-changing recollection of the date of the check transaction even arguably impeaches Creta's testimony.[6] Flowers told the grand jury that his first deal with Creta occurred "[s]ometime in early 1980. I would say March, April, May. The second time was one to three months following that, so within that time frame, I'd say between June—June to the first of the year." In other words, Flowers' grand jury testimony was that the transaction occurred sometime between April through August. Obviously, April 24 was within that period. Thus, Flowers' grand jury testimony corroborated Creta's testimony on the date of the check transaction.

Likewise, Flowers' statement to Agent O'Brien that the $35,000 transaction at the bank drive-in window occurred "possibly" in June or July contains no conflict with Creta's testimony that could have affected the verdict. Agent O'Brien testified that Flowers had a poor memory for dates and was unable to give a specific date for anything. Even if Flowers' equivocal answer could be taken as definitive, it contradicted every other answer Flowers gave on the subject. If anything, Flowers' estimate that the transaction occurred "possibly" in June or July contradicted his own testimony that the transaction occurred when the weather was cold. In sum, Flowers' recollection of the date was either consistent with Creta's testimony or so vague and self-contradictory that its impeachment value was nil.[7]

Moreover, Creta himself admitted he was less than certain of the date. Although Creta pegged the date of the cocaine deal to the date when the check was negotiated, he had no independent recollection of the date. He specifically acknowledged he had encountered some difficulty in remembering the date, and that he "couldn't put the figures and times together exactly." We conclude that the same jury that heard that admission would not have returned a different verdict had it heard Flowers' equivocations on the subject as well.

### III.

For the foregoing reasons, the judgment below is affirmed.

AFFIRMED.

---

6. In addition, Breit contends that two other discrepancies between Creta's testimony and Flowers' statements of a drive-in bank transaction prove that they are describing separate, unrelated transactions. We disagree. First, Breit argues that Flowers failed to confirm Creta's receipt of a $15,000 cashier's check. Flowers' grand jury testimony, however, was either (1) that he simply did not know whether the proceeds returned by the teller were entirely in cash, or (2) that more than one check was involved in the transaction. This also explains why Breit did not pursue his contention, based upon Flowers' May, 1984, statement, that Creta received in cash the entire proceeds of the $35,000 check, at the hearing on the new trial motion.

Second, Breit points to the discrepancy between (1) Creta's testimony that the check transaction involved a single payment of $20,000 for 10 to 11 ounces of cocaine and (2) Flowers' statements that the "bank visit deal" he observed involved the second or third installment on the purchase of one kilogram of cocaine for $60–65,000. This argument was not presented to the district court. In any event, the argument is without force because the only issue before the jury was whether the $35,000 check was intended to fund a cocaine deal, as Creta testified, or to pay off gambling debts, as Breit claimed. Both Creta and Flowers were clear that the $35,000 drive-in window transaction they remembered was intended to fund a cocaine deal of some sort, and not for any innocent reason.

7. Moreover, there is no evidence that Creta was involved in more than one check transaction.